Let's hear the appeal on number 13-1159, RICHTEK TECHNOLOGY CORPORATION against the ITC. Mr. Stephens. Good morning, Your Honors, and may it please the Court, I'm Scott Stephens from Alston & Byrd here today on behalf of appellants in this particular matter, RICHTEK TECHNOLOGY CORPORATION and RICHTEK USA, Inc. With respect to UPI's post-consent order products, the Commission erred in two separate, independent respects, each alone warranting reversal. First, the Commission ultimately applied the incorrect legal standard to determine whether or not UPI's post-consent order, and in doing so, it chose to agree to cease its sale for importation or its importation of controllers, quote, which are produced using or which contain RICHTEK's asserted trade secrets, end quote. Those are the words that they agreed to. Those are the words of the consent order. And words matter. They're very important. As a result, and as all parties now seem to agree, the only relevant legal standard related to whether or not UPI's conduct did indeed violate the consent order is whether or not its conduct violated those words, whether or not its products were, quote, produced. So why didn't you make this argument to the Commission? This argument was front and center throughout the entirety of the proceedings. You made it clear as day to the ALJ, both in your initial brief and in your post-hearing brief, clear as day. The problem is you abandoned it before the Commission. Why would you abandon it? Your Honor, respectfully, we don't believe that we did abandon it. Then show me where you argued it. We believe that we argued it in several locations, including on pages 1 and 2 of that particular petition for review, especially where we urged that had the ALJ correctly applied the Commission precedents, the ALJ would have considered Rich Tech's evidence that the same trade secrets he agreed were present in the formerly accused products continued to be found in the newly developed UPI products. What precedents were you referring to? We were talking about the precedents of what you need to do in order to find a violation of the consent order. Indeed, when the Commission instituted the investigation to begin with, its mandate to the ALJ was look at the consent order and determine whether or not the language of the consent order was violated. The mandate was not to determine whether or not infringement occurred or whether or not trade secret misappropriation occurred. The mandate to the ALJ was to look directly at the consent order and decide whether its terminology had been violated. Now, what additional remedy are you seeking beyond if, let us assume for the sake of this question, that the order, the exclusion order is sustained? What else are you asking for? Your suggestion, Your Honor, if the consent order is sustained? Yes. We are asking that this Court reverse the underlying determination and hold that, indeed, the correct legal standard is to determine whether UPI's products were produced using or contain the technology in question. And, indeed, given the facts on the record, we don't believe that there is any question other than, indeed, they do. The newer products embody those pieces of technology and have the same indicia of copying as the older products do. So we would ask the Court to reverse the underlying holding, institute a holding that, indeed, there was a violation of the consent order with the new products, and then remand for further consideration of remedy issues. All parties appear to agree at this point in time that a consent order is, indeed, to be construed like a contract. And it appears that all parties agree that the salient overall question is simply whether the words of the consent order were violated. I'm sorry. Before we leave the waiver issue, that one sentence that you quoted, is that your best sentence to preserve the argument? If you read that paragraph, which starts on the first page of our petition and spills over to page 2, we believe that we had, given what had happened in the case up to that point in time and the two briefs that Your Honor had mentioned earlier, we believe that that fairly and adequately gave notice that we were The first is whether or not the question of independent development should have arisen at all. We suggest that simply comparing the two sets of products to the trade secrets is all the Court needed to do. And second, there is a separate argument regarding what the correct independent development standard would be were it to be applied. So I do think, Your Honor, if you read the paragraph that begins on page 1 of our petition, spilling over to page 2, that that is where we preserve the issue for further review. Where? Tell me the sentence in which you do. If you don't have it, then somebody give it to him. You mean you didn't lug all 17 volumes of this appendix with you? We did, Your Honor. A colossal waste of trees. I tend to agree with you there. The sentence in question is on page 2 of our petition. It can be found in the record at JA 5913 or on page 6 of our opening brief. And I'll read it again. Had the ALJ correctly applied commission precedence, the ALJ would have considered Rich Tech's evidence that the same trade secrets he agreed were present in the formally accused UPI products continued to be found in the newly developed UPI products, which is inconsistent with accepting UPI's argument that it avoided contamination of its new products with Rich Tech's trade secrets. What we are saying there is that the question of independent development need not and indeed should not have ever been reached. If you determine that the old products embody the trade secrets and that the newer products are identical or nearly identical to the old products, that's the end of the inquiry. You stop there and you find a violation of the consent order. So you don't think I should interpret this as challenging directly the determination of misappropriation, but rather, even though that's what the entire brief is about, on the factual determination of misappropriation, but rather I should interpret that one sentence at the beginning of a brief, which challenges the facts of misappropriation, as instead setting out a separate appeal point, which is that you never had to prove misappropriation at all in order to have a violation of the consent order. That's what you're asking me to take that sentence out of context and read it to me. Your Honor, not only is there a factual contest in the brief, but the brief goes on and on about the legal question. Indeed, we think… Misappropriation and independent development. Yes, Your Honor, and we think it was wrong on two different levels. The first level is whether or not it was a relevant inquiry to begin with, and the second… Where is the part about whether it's irrelevant, because that's the part I don't see. We believe that if you read the entirety of that paragraph from page one to two, consistently with the position taken throughout the entire case, that again, we fairly and adequately preserve the issue for further review. Okay, well, so here's what you say in the beginning of that same paragraph that you plucked the one sentence out of. In analyzing UPI's independent development defense, the ALJ started his analysis by considering the elements of the defense. The ALJ then relied on a 1982 Ninth Circuit case stating that when a plaintiff shows that his valuable trade secret is confidential, disclosed to defendant, and defendant subsequently makes a closely similar device, the burden shifts the defendant to show independent development. That burden shift is correct, but the ALJ appears to have read this case to mean the accused party only needs to show it could have arrived at the process by independent invention, inspection, or reverse engineering, rather than using the correct standard that it did so based on a preponderance of the evidence. This is all about misappropriation. Your Honor, we believe that it's about two things. One, what we're talking about, and second… Okay, so what you're saying is you shouldn't have found independent development because the fingerprints are all over it of the trade secret. But that, to me, is clearly an argument about independent development and misappropriation. I don't see an interpretation argument on the consent order. I think it's two levels. I think the paragraph is entirely about interpretation, not about factual challenge. The part that you just read is whether or not the correct standard were independent development to be a relevant inquiry, whether or not the proof is required to show actual independent development, or whether or not the proof is required to show that one could have arrived at it by independent development. That's a separate legal question. Certainly later on we get into the factual predicates for those findings, but at that point in time I do think we're dealing solely with the legal question of what the particular standard is. Putting aside the issue of the correct construction of the consent order, we believe that the Commission's decision with respect to the newer products is not supported by substantial evidence, even were independent development to be a relevant inquiry. Based upon Commission precedent... I understand the facts, right? With regard to the former products, they found there was misappropriation. They actually found misappropriation, right? They said the e-mails showed they were out to steal it, they stole it, the fingerprints are all over it. Yes, Your Honor. The designs have the same label, the same mislabel, the same everything. Yes, Your Honor. We think the facts are quite blatant here. We don't think the judge needed to reach misappropriation as to the older products, but he did so, and he found in no uncertain terms in favor of RICHTEC based upon all the indicia that you just mentioned. As you mentioned a minute ago, when talking about independent development, there's a burden shift at the ITC. It's on the respondent. The burden of persuasion is on the respondent to show, quote, its heavy burden of persuasion, end quote, that it indeed independently developed the products in question. But by relying entirely upon the uncorroborated hearsay evidence of UPI's experts regarding what a particular UPI employee, Mr. Charles Chang, did, and Mr. Charles Chang was excluded from testifying at the hearing given the fact that UPI did not disclose his actions during discovery, the ITC erred by relying purely upon this hearsay evidence to support its determination regarding independent development. Did the ITC actually make a fact finding that Mr. Chang did not give trade secrets 11 and 13 to the clean room team? Did he actually make that fact finding? Your Honor, the only thing that I can deduce from the record regarding factual findings related to 11 or 13 is Mr. Chang's action. In the bullet point list that the ALJ included in it. But you don't have any evidence that Mr. Chang gave it to them, right? You're relying only on the footprint, the fingerprint, the labels and the mislabeled, right? Mr. Chang was tasked to go into a room, allegedly by himself, and come up with the ECS INI file as well as the circuit symbols and basic schematics. And he gave that information, he was a UPI employee working at UPI, gave that information to the outside design firms. That's all the record shows. So we're alleging that in that process itself there is no substantial evidence to say that independent development happened in that mysterious room. That's the only evidence of record offered regarding how trade secrets 11 and 13 and their analog and the UPI products came to be in existence to begin with. You all allege that Mr. Chang gave them to the clean team. UPI alleged that Mr. Chang was the one who created the file and created the circuit symbols. That's UPI's allegation. It is not their allegation, nor ours, that the outside clean design team came up with anything related to 11 and 13. That was done in-house. It was done in-house. I guess I'm misunderstanding. I understood that you were arguing that Mr. Chang had to have given them 11 and 13, otherwise how could they have these identical diagrams? Yes, Your Honor. What we're saying is that when he went into the room to create the allegedly new ECS file and the allegedly new symbols and schematics, that he indeed did have rich text trade secrets and create products that read directly on rich text trade secrets. And therefore that information was tainted from the second that they sent it to the outside designer. That's exactly what our position is. I mentioned the Gartzite opinion in which this court held that mere uncorroborated hearsay or rumor does not constitute substantial evidence. To that point, this very court has further analyzed when hearsay evidence can and when it cannot be substantial evidence. And this court did that in the Doe v. U.S. opinion, which can be found at 132 F. 3rd, 1430. In that case, this court held that the gravamen is whether the party against whom the hearsay evidence is offered ever had the chance to cross-examine the witness in question. I guess all this is relevant to a fact finding that Mr. Chang didn't begin by using trade secret 11 and 13, which is why I asked you, did the ALJ or the commission expressly make that finding? I don't think it did. But see, the problem is it's not really – the cases you're citing aren't really relevant to the overall decision because the only evidence of record is not this double hearsay twice removed nonsense. The evidence of record includes millions of dollars spent on cleanroom procedures, etc., etc. And that seems to be what most of the decision below was in fact based upon. This Mr. Chang part of it seems to be like a minuscule part. So what I'm trying to understand is what are we to make of all of that? Sure, I have two things to say about that. I understand that, Your Honor, and I'll quickly wrap up. You say millions of dollars. You translate that into American dollars is around $135,000 that went into their entire design effort that allowed them to come up with these new products. But directly to your question is – Was it not millions of dollars? Was I wrong? I believe the brief said it was $4 million new Taiwanese dollars, which translates to about $135,000 United States dollars. I get it. Putting that aside, the direct answer to your question is none of those actions of the outside design firms, none of them relate in any way to trade secrets 11 and 13. Maybe they did design other parts of this technology anew. Maybe that's true, but nothing they did is argued in this case to have any relevance to 11 or 13. You won't find that in the ALJ's opinion. You won't find that in the commission's opinion, and you won't find that in the briefs in this case either. It was all Mr. Chang that had to do with the technology that's analog to trade secrets 11 and 13. the only ones you're maintaining on appeal, meaning have you relinquished everything else, all the other potential trade secrets? Your Honor, I do notice my time's up. If I might answer your question. Please answer your question. Thank you, Your Honor. No, we still argue trade secret 12 as well, and the very quick recitation of that is the outside design firms came out with the layouts, which are the physical embodiments of the silicon, and gave that to UPI in something called version A. And even if you assume that that was free and clear, version A is not what went into production. UPI's in-house team changed it, modified it, and what went into production was version C, D, or E based upon the individual checks. Thank you, Your Honor. Thank you, Mr. Stevens. Mr. Chang. May it please the Court, Clark Cheney for the commission. Just to review, I think it's clear that Rich Tech has waived the argument about independent development, referring to the same passages that my opponent referred to in JA 5912. Rich Tech argued that, quote, in analyzing UPI's independent development defense, moving down through the paragraph, the ALJ correctly shifted the burden. That's on page 5912. Then moving on to page 5921, Rich Tech affirmatively argued, the respondent needs to prove that it actually developed its designs independently and not by using the trade secret owner's misappropriated trade secrets. So they're taking exactly the opposite position here that they argued before the commission in their petition for review. Well, but you agree, I'm sure you will, that the ALJ, before the ALJ, both in the initial brief and the post-hearing brief, they did clearly argue the consent order language, the containing language. I think that what I heard pointed to today was a factual argument that because these products had these fingerprints before, the ALJ erred. Let me read to you from the briefing before the ALJ. The consent orders to UPI and SAFIRE have no requirement of proving trade secret misappropriation per se, only a finding that any DCDC controller or products containing the same, which are produced using or which contain Rich Tech's trade secrets. Enforcement respondents should be precluded from challenging any Rich Tech-asserted trade secret under any defense pertaining to misappropriation in light of the consent orders. I mean, I feel like they really, really clearly argued that the only thing they have to prove is that the products imported in contain Rich Tech's asserted trade secrets. I feel like they really clearly argued that. You're arguing waiver, and I feel like they really crystal clear as day argued it in both their initial and their post-hearing brief to the ALJ. That may have been the case, but their argument is to argue to the commission where the ALJ erred when they petitioned the commission for review. And when they don't do that, and in fact, when they take an opposite legal position, Well, that's the question. Do they take an opposite legal position, or do they argue in the alternative? I mean, at this point, once the ALJ has reached a conclusion based on independent development, certainly at a minimum, they've got to argue both, right? They've got to argue still for the containing language, and then they also have to argue alternatively. And even if independent development is a prong that could get them out from under this consent order, they don't meet it here. I would agree that a party is allowed to argue in the alternative, but when this party uses phrases like the ALJ correctly did X, With regard to the independent development defense, if that's part of it. Right, and I don't see in the petition for review any statement that we think he erred here, but in the alternative we think he should have done. I don't see anything like that. I see affirmative statements that the ALJ correctly applied the independent development standard, but he misread the facts. That's what I see in the petition for commission review. And then I see affirmative statements about what a respondent has to prove and what the ALJ did correctly. If I were to agree with you, suppose I were to conclude that the brief before the commission is ambiguous, but that I was leaning your way, meaning I certainly don't see the argument expressly made. Can I interpret some broad language as possibly holding on to it? Certainly it's not in there explicitly. But we have the discretion to waive waiver. Certainly. One of the things we take into account, of course, is would there be unfair surprise or harm to the opposing party? And given the fact that this was fully vetted both in every brief except for ultimately the one before the commission, which is why we have waiver, I don't see that there would be any unfair surprise to UPI of waiving waiver, exercising our discretion to allow this argument. What do you think? It would also be a violation of the commission's rules about petitions for review, which specifically state that any argument not raised in a petition is deemed abandoned, and therefore we would have a decision before this court that the commission has never ruled on in the first instance. And I think that might deprive this court of jurisdiction. No, maybe we can just vacate and remand and tell you to go rule on it. We're obviously obligated to follow what the court does. I'm not eager to do fact findings. I'm just trying to figure out whether or not we ought to. It's a pure legal question, right? And it's fully briefed, at least in front of the ALJ. If we return to the legal question, the commission will still prevail. That's the Moore case, which states that if there is proof that a defendant independently developed a technique that resembles the trade secret, then the defendant did not use the trade secret. I guess time out. I guess the language that I'm focusing on is which contain rich Texas servant trade secrets. It's the interpretation of the consent order. I think there's no question that these products do not contain the trade secrets. The trade secrets are alleged to be computer designed files. The products that come into the United States contain no design files whatsoever. The design files are only in Taiwan. So the only question is whether these products were made using those design files. And that's the Moore case. And on the merits, on the legal merits, even if we were to leave waiver behind. Wait, time out. What does it mean then, which contain rich Texas servant trade secrets? If you're suggesting that the trade secrets are only processes that are used to manufacture rather than physical objects, why in the world would the consent order be written to say which contain rich Texas servant trade secrets? There was a whole broad spectrum of alleged trade secrets in the underlying action. What we're talking about today in this case is only three. That's why they're numbered 11, 12, and 13. Were the other ones physical things? I honestly have no idea. I focused on the case that was brought to the commission, which was focused on 11, 12, and 13. But there is, I think it's clear in the briefs, I think it's clear in the complaint and in the answer to the complaint, that the trade secrets here are not the circuits themselves because these are fairly routine power converter circuits. One of them, I don't want to divulge what might be alleged to be confidential information, but I would urge the court to look at what the actual circuits do. The circuitry itself was not alleged to be a trade secret. It was the symbol libraries, the initialization files, things that only reside in design computers in Taiwan were alleged to have been used to create these products. Aren't there circuit diagrams as well among the trade secrets? There are design files. If you look at the circuit that's in the diagram, I think, again, we don't look beyond the trade secrets in this case because we're not allowed to question whether they are. But if you look at what was alleged to be the trade secret, the words are always used, schematics and files. But it was never denied that those circuits were used? It was denied that the computer design files that were alleged to have been misappropriated were not. UPI denies that it used misappropriated design files in its post-consent order products. Well, they have a general denial of everything. Is this what the ITC based its decision on? That the downstream products don't contain any of these trade secrets? The ITC addressed both allegations. The ALJ looked at a large amount of evidence concerning the cleanroom procedure, including the advice of counsel from a reputable firm, the amount of money expended, the instructions given to outside agencies, the lack of proof of anyone providing outside agencies with any rich tech materials. The ALJ listened to the testimony of people involved in the cleanroom procedure. He saw them testify in the courtroom and made a judgment about their credibility, and on the basis of that suite of evidence found that there was no trade secret misappropriation for the post-consent order products. And that substantial evidence, even if some other evidence in the record detracts from it, this court should affirm based on the substantial evidence relied upon by the ALJ. I see my time has expired. Thank you, Mr. Chairman. Mr. Levitan. Thank you, Your Honor. Rich Tech's position that it need not have proved misappropriation and that independent development was not an available defense certainly was waived. Rich Tech took precisely the opposite position in its petition to the commission. For example, Rich Tech stated, quote, the ALJ correctly stated that federal common law governs the misappropriation claims in this investigation. That's a JA-5919. And in connection with independent development, as Mr. Chaney said, Rich Tech stated, quote, the respondent needs to prove that it actually developed its designs independently and not by using the trade secret owner's misappropriated trade secrets. That's a JA-5921. This case is very much like the Texas Instruments decision cited in our briefs. Your Honor is correct that Rich Tech raised this argument in its post-hearing brief, but then did not preserve the argument in its petition to the commission. That was the same factual background in the Texas Instruments case where the court held that the position was waived, and we submit that's what this court should hold as well. With respect to the language of the consent order, the language says, requires that UPI not import products, quote, which are produced using or which contain Rich Tech's asserted trade secrets. To show that a product contains Rich Tech's trade secrets, we submit that one must show misappropriation. If there's no misappropriation, the product does not contain Rich Tech's trade secrets, regardless of any similarities in product features. The commission found that UPI's new generation products were independently developed. As the Third Circuit said in the Moore decision, citing in our briefs, if there is proof that the defendant independently developed a technique that resembles the trade secret, then the defendant did not use the trade secret. Where UPI's products were independently developed without any misappropriation, as the commission found, by definition, those products do not use or contain Rich Tech's asserted trade secrets. What about the fingerprints, the label, the mislabel, all that stuff? It's really troubling. Your Honor, in fact, the ALJ reviewed all of that evidence and found that there were far more differences between schematics and ECS INI files than there were similarities. Well, but that's not the question. I agree and would have no problem with that conclusion, and certainly the pre-consent order products and the post-consent order products have their differences. But the problem is the similarities are impossible to overlook, because the similarities are errors, little errors in labeling, font lineups that don't match up, lines in circuit diagrams that you could have put anywhere in the diagram, but it appears in the identical spot. The problem is it's like a fingerprint when you have errors like that in a document, and then when those errors replicate themselves in the post-consent order product, it causes me a lot of pause about whether or not those schematics were used to create the post-consent order product. I don't believe, Your Honor, that there's evidence that there were errors in the UPI schematics or in the UPI code. Okay, then how come for your circuit diagrams, for an N1, N2 differential there, underneath that there's a notation that says N3, N2, N2, N3. What does the N3 mean for UPI? Your Honor, these are transistors that are used in the schematic, and these notes denote the placement of these transistors in relation to one another. So what N3 means to UPI right there in the N1, N2 differential pair? This note is saying where the N3 transistor should be placed, and I would submit, Your Honor, there's no evidence that the note... Be a little more specific. How come it doesn't say N1, N2, N2, N1? Why does it say N3? Because N3 is also a transistor used in the schematic. But it's right underneath the N1, N2 differential pair. Right, but it's a note as to where the N3, N1, N2 transistors should be placed in relation to each other. And what about the fact that the label N3 is not aligned? I mean, come on. There's no chance that this isn't copied from the other diagram. You can argue, okay, look, it's copied, but that doesn't mean that we stole the trade secret, we copied only the label or something. But it just seems absolutely ludicrous to argue that that wasn't copied. No, I don't believe, Your Honor, that that's evidence of any copying. These parties all use the same design tool. The design tool forces you to place notations and lines in a certain way. When you're using the same design tool, you're going to have similar placement on a schematic. It's going to look similar. It's not evidence. No, the N3 is not going to be raised above the N2, N2, N3. That is a simple error. Somebody entered a return improperly. That's all that is in the schematic design tool. There's not evidence of that, Your Honor. In fact, I believe that— You have no evidence in this record that N3 looks like that by virtue of some design tool making it so, right? I can't answer that. I don't know of it as I stand here. Your Honor, Mr. Stevens referred to Mr. Charles Chang and stated that he provided to the outside designers ECS INI initialization files, symbol libraries, and he said basic circuit schematics. There's, in fact, no evidence in the record whatsoever that Mr. Chang provided any circuit schematics to the outside designers. That's not what he was asked to do. That's not what he did. I guess here's the problem, though. If I think that the post-consent order products improperly use the same exact labeling, and I think that it's impossible that it could have happened by chance, then it had to have gotten into the clean room somehow. And so the question is how. I don't have any problem with the fact findings that there existed a clean room procedure. The problem is it seems absolutely clear from the circuit diagrams that that procedure was violated somehow. And so I don't know what to do with that. Respectfully, Your Honor, I don't believe that is clear from the circuit diagrams. But I would also say it was Rich Tech's burden to prove misappropriation, and there's no evidence whatsoever that any Rich Tech confidential information was transferred to the outside designers. I'm sorry, go ahead. Chang gave the outside designers the ECS INI file, right? He did, yes. And there's 23 lines of code that are identical to the trade secret, right? There's 23 lines out of 125 that Rich Tech claims were… It's identical. The variable is everything. It's exactly the same. Right, and many of those entries, Your Honor, are reserved or calculated by the design tool. There's no discretion in the matter. And there was evidence in the record on that. So Mr. Chang didn't have discretion where the design tool reserves or calculates the entries that Rich Tech claims are its trade secret. In fact, that design tool corroborates Mr. Chang's testimony. Another thing that corroborates Mr. Chang's testimony was Mr. Vilfer's forensic analysis where he compared Mr. Chang's ECS INI files to Rich Tech's ECS INI files, and he found through his fuzzy hashing forensic technique that the files were statistically dissimilar. So he found no evidence of copying because he found no statistical similarity. Here's the problem. We have a finding of misappropriation on the pre-consent order product. We have theft. We've got emails and everything, and the ALJ and the Commission found there was misappropriation, that UPI stole Rich Tech's trade secrets and used them. So then we've got post-consent order products, and you have the institution of a clean room. The problem is the product that comes out, ultimately the circuit diagrams have much of the same stuff from the trade secret. So why do they have to prove misappropriation twice? You stole it once and used it for your product. Why do they have to prove that you stole it a second time? There's already fact findings in this record that you stole it once and used it. You misappropriated it. Well, we certainly think that it's Rich Tech's burden to prove misappropriation and or infringement with respect to each specific type of product, not just the old generation products, but the whole point of independent development is that you are creating a product free from misappropriation. And UPI never waived the right to independently develop new products. It certainly didn't believe it was doing that when it entered into the consent order. And so Rich Tech does have to show it does retain that burden to prove violation of the consent order by proving misappropriation. Your Honor, on trade secret number 12, your circuit layout, is there any difference between the post-consent order layout and the trade secret layout? Your Honor, there are a number of layouts that we addressed in our brief. Okay, I'm looking at page 33 of the gray brief. It shows me the circuit layout for trade secret number 12. It shows me your client's pre-consent order circuit layout. And then it shows me your client's post-consent order circuit layout. They look like mirror images of each other right down the line. And if there is even a sliver of a difference, I'd like you to show me, because I don't see one right now. This is the zigzag layout pattern, and there is substantial evidence for the Commission's finding in this regard. UPI's outside designer, Mr. Chen, testified as to where he discovered this zigzag metal layout pattern. He discovered it when he worked at a prior employer, and he also knew of it from other companies' products. That's at JA122898 and 99. So there's testimony in the record as to how he knew of the zigzag metal layout pattern and why he used that pattern. So there's substantial evidence that does support independent development. Your Honor asked if... Are you ready to move on? Oh. Do you want to pursue this point? No. Are you ready to move on? Okay, thank you. Okay, I think we've exhausted your time. Thank you. Thank you, Your Honor. To put the big picture of this case back in context, the evidence of theft here was overwhelming. We have e-mails that said, please go steal this. We have products that are identical down to the seventh layer of significant digit when it comes to the circuit layouts. And when they got caught with this, they instituted this alleged cleanroom procedure, which, again, after saying that they would not come into this technology for a period of 10 years, this cleanroom procedure, about $135,000 U.S. dollars was spent. Six months later, they have a new slew of products that just so happen to have the identical or nearly identical technology that the old products did that are in the trade secrets. We submitted... That's difficult to believe. But trade secrets 11, 12, and 13 are the only thing left in this, right, right now? Yes, Your Honor, 11, 12, 13. And those are schematics and other things, but not the products themselves, the circuits themselves. So why isn't the government right that you're... I hate to say this, but that your entire consent order construction argument is sort of pointless because you can't prove the products contain the schematics. Sure. First off, we can prove that they were produced using those schematics. Right, but that's not the argument that you make on appeal. The argument you make on appeal is the containing language, right? I think we focus on both because I think the answer is both. They contain the physical manifestation of the trade secrets, and that's just as much the trade secret as the actual design file that goes into the front end. I don't understand. The circuit is not a trade secret. It is a library of symbols and things on the schematics that are used. It's not the circuit itself. The circuit doesn't contain any of those symbols. The schematic that was used to produce the circuit contains the symbols, but the circuit does not have the symbols. The circuit doesn't have a symbol and sort of ASCII characters. Of course not. But the circuits, the physical manifestation of those circuits, absolutely are produced directly in consideration of those symbols. I mean, what is the trade secret here is the exact way that those circuits are laid out, and indeed that's true on the design side when you're looking at the files on the computer screen, and that's true when the silicon is actually laid in the chip. So absolutely it's produced using our design files, our schematics, and it indeed contains the physical manifestation of those schematics. So we believe that under either, the produced using... You don't have a trade secret on the circuit, right? I mean, how could you? This is one of the simplest circuits in the universe, nothing personal. We don't have... What I understand your trade secret to be is the contribution of the labels and the symbols and the things that are going to make it easier to produce, but not the actual... I mean, there's only four components. This is a really simple circuit. And there's many of these circuits, but you're right. We do not have a trade secret in the concept or the functionality of a general flip-flop circuit. I completely agree with you there. But the precise manifestation of it, the way that Rich Tech does it, absolutely we do have a trade secret in that. There's a million... What do you mean the way they do it? The specific way that that's schematically laid out with different parameters, absolutely that's a trade secret. There's an infinite number of ways to make a flip-flop circuit. When you look at different geometries, exactly how things are connected. And there are an infinite number of ways that UPI could have done it and had the functionality of a flip-flop circuit without using the technology that Rich Tech has in its trade secrets. But that's not what they did here. Out of the infinite possibilities, they chose the one that's Rich Tech's. And that's true both on the design file side, and that's true in the physical manifestation once the silicon is ready. I don't understand your physical manifestation argument at all. So if you want to use the rest of your time, then why don't you go for it? Fair enough. To get back to the question of whether this question was appropriately preserved, as you indicated earlier, this court does have discretion in looking at that question. And some of the most important elements of the test are whether or not there was surprise to the other party. That's clearly not the case here. It was directly raised on many different occasions. Whether or not this is a legal argument, there's no question that the interpretation of the consent order is purely legal. Indeed, UPI agrees with that on page 23 of its brief. And lastly, whether there's a broader applicability to the question here. Indeed, there is. The consent order in this case is still in place and still applies to future actions for the next seven or so years. And indeed, the other remedies that the ITC is issuing in trade secrecy— What do you have to say to the other side's argument that the notation of N3, N2, N2, N3 is just showing that they're all close to each other? Your Honor, respectfully, I don't think that there's anything to that. What you're getting at is right. The differential pair was N1, N2. The concept of the N3 transistor has nothing to do with that area. There is an N3 transistor elsewhere on that schematic, but it has nothing to do with what's being discussed with the N1, N2 differential. It can't be anything but an error. Thank you very much. I appreciate it. Okay. Thank you. Thank you all. The case is taken into submission.